# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HICHAM ELKHARROUBI, ET AL.

                                  \*

     Plaintiffs

                                  \*

v.                                                    Civil Action No. TJS-17-2169

                                  \*

SIX FLAGS AMERICA, LP, ET AL.

                                  \*

     Defendants        \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

A number of motions are pending before the Court: the "Motion *in Limine* to Preclude Plaintiff from Calling Andres Calderon, Ph.D." (ECF No. 63) filed by Defendants AZS Industries, LLC ("AZS"), Splashtacular, Inc. ("Splashtacular"), and Six Flags America, LP ("Six Flags") (collectively, the "Defendants"); Defendants' Motion for Summary Judgment (ECF No. 64); the Cross-Motion for Summary Judgment (ECF No. 65) filed by Plaintiffs Hicham Elkharroubi ("Elkharroubi") and Lamya Ghala (collectively, the "Plaintiffs"); and Plaintiffs' Motion *in Limine* (ECF No. 66).[1] For the reasons set forth in this Memorandum Opinion, the Defendants' Motion *in Limine* (ECF No. 63) will be granted, the Defendants' Motion for Summary Judgment (ECF No. 64) will be granted, and both of the Plaintiffs' motions (ECF Nos. 65 & 66) will be denied. Summary Judgment will be entered in favor of Defendants.

## I.    BACKGROUND

For purposes of this Memorandum Opinion, all facts will be considered in the light most favorable to Plaintiffs. On August 12, 2015, Elkharroubi visited the Six Flags Hurricane Harbor Water Park in Bowie, Maryland. (ECF No. 55 ¶ 17.) At that time, the water park was owned and

---

[1] On May 29, 2018, this case was referred to me for all proceedings pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4 (ECF No. 28).

operated by Six Flags. (*Id.* ¶ 15.) At some time before Plaintiffs' August 2015 visit to Six Flags' water park, Splashtacular designed a water slide and sold it to Six Flags under the name DownUnder (the "water slide"). (*Id.* ¶ 13.) In addition, at some time before Plaintiffs' August 2015 visit to Six Flags' water park, AZS purchased the assets of Splashtacular. (*Id.* ¶¶ 4-5.) On the day of his visit, Elkharroubi elected to ride the water slide, which Six Flags named the "Bonzai Pipelines." (*Id.* ¶ 19.)

Put simply, the water slide operates as follows. Riders are placed on a trap door, sometimes referred to as a drop gate, in a launch module. (*Id.* ¶ 20.) The back part of the module is tipped back at a 20.5 or 22-degree angle so that the rider leans back and is supported against the water slide before the trap door opens. (ECF Nos. 63-4 at 80 & 65-15 at 13.) Before the trap door opens, it is locked in place. When it opens, the locks are removed and the trap door "gate is pulled open rapidly by two air cylinders so that the drop gate is completely out of the path of the falling guest." (*Id.*) Once the trap door opens, the rider drops down into the flume of the slide, which drops approximately six stories and follows multiple rapid turns before dropping the rider into a splash pool at the bottom of the ride.[2] (ECF No. 55 ¶ 20.) When Elkharroubi rode the water slide, his left knee and leg were injured. According to Elkharroubi's submissions, his injury was caused by a malfunction of the trap door, which struck his leg after the trap door failed to open completely. Elkharroubi asserts that the trap door malfunctioned because it had not been properly maintained. In addition, Elkharroubi asserts that the water slide was defectively designed, and argues that the trap door (and perhaps the area adjacent to it on the platform)

---

[2] Of course, the water slide is not a simple machine. Its mechanics are described in greater detail by Matt Lenz in his written report dated October 30, 2018. (ECF No. 35-15 at 13-23.) Mr. Lenz was designated by AZS and Splashtacular as an expert witness. (*Id.* at 2-3.) The parties do not disagree about how the water slide is designed to operate. (*See* ECF No. 63-4 at 117.)

should have been coated in rubber padding. Such rubber padding, Elkharroubi suggests, would have lessened any impact of a rider against the trap door or the platform and thereby reduced the risk of serious injury. Defendants dispute Elkharroubi's version of the facts, but the Court's ruling on the pending motions does not depend on any disputed facts.

## II.    ANALYSIS

The Court will begin with Defendants' Motion *in Limine* (ECF No. 63) because, as explained below, the testimony of Plaintiffs' proffered expert, Dr. Andres Calderon, is vital to Plaintiffs' claims. Without Dr. Calderon's expert testimony, Plaintiffs cannot prevail on any of their claims against the Defendants.

### A.    Admissibility of Expert Testimony

Under Rule 104(a) of the Federal Rules of Evidence, the Court is responsible for determining preliminary questions conerning the qualification of a person to be a witness and the admissibility of evidence, including the admissibility of expert testimony under Fed. R. Evid. 702. "With regard to expert testimony, it is well settled that '[t]he party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence.'" *Maryland v. Dent*, No. ELH-18-360, 2019 WL 1795531, at *1 (D. Md. Apr. 23, 2019) (quoting *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011).

"Expert testimony is admissible under Rule 702, then, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 592).

The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—

that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. Thus, an expert's testimony is admissible under Rule 702 if it rests on a reliable foundation and is relevant.

*Id.* at 260-61 (internal citations and quotation marks omitted). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that the *Daubert* standard also applies "to the testimony of . . . other experts who are not scientists").

When exercising its "gate keeping function" to consider the admissibility of expert testimony, the Court undertakes a "flexible" inquiry, "focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594-95). The Fourth Circuit has directed district courts considering the admissibility of expert testimony to "be conscious of two guiding, and sometimes competing, principles." *Id.* at 261.

On the one hand, the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. And, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. On the other hand, the court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading. And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded.

*Id.* (internal citations and quotation marks omitted).

When applying *Daubert* to challenged expert testimony, courts typically consider multiple factors, including

(1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique

has achieved "general acceptance" in the relevant scientific or expert community.

*United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593-94).

These factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The factors are not a "definitive checklist," and not all factors necessarily apply in a given case. *Id.* at 150-51.

### 1. Dr. Calderon's Opinions

Plaintiffs produced two sets of expert witness disclosures relevant to Dr. Calderon. First, on October 9, 2018, Plaintiffs produced their initial expert disclosure under Fed. R. Civ. P. 26(a)(2). (*See* ECF No. 65-12.) In this disclosure, Plaintiffs designated Dr. Calderon as an expert witness and attached Dr. Calderon's written report dated October 9, 2018 (*Id.* at 19-49). Second, on February 14, 2019, Plaintiffs produced their rebuttal and supplemental expert witness disclosures under Rules 26(a)(2) and (e)(2). (ECF No. 65-13.) Plaintiffs' supplemental expert disclosure includes Dr. Calderon's supplemental written report dated February 14, 2019 (*Id.* at 5-14).

In Dr. Calderon's initial written report dated October 9, 2018, his opinions are listed on pages 13-15 of the report (ECF No. 65-12 at 31-33). Those opinions are as follows:

- The trap door mechanism was safety related and warranted preventative maintenance to effectively assure that the doors would fully open.
- Mr. Elkharroubi['s] injury occurred as the trap door partially opened, he began his fall through the floor and into the slide where the opening was partially occluded and Mr. Elkharroubi impacted his tibial plateau, the front of his left leg near the knee, with the edge of the trap door.
- There was no other mechanism or object, other than the trap door partially occluding the slide chute, that would produce the injury to Mr. Elkharroubi as he was dropping down the slide.

- Mr. Elkharroubi did not behave in an improper manner and did not violate any of the Rider Responsibilities that were provided to him.
- The trap door became stuck due to lack of proper maintenance of the trap door pneumatic mechanism or mechanical systems.
- If the trap door had operated in its usual safe manner, there would not have been any object or mechanism of injury that would result in Mr. Elkharroubi's left tibial plateau fracture.
- Six Flags did not have proper maintenance procedures to identify failure mechanism for the Bonzai Pipelines mechanical systems.
- Six Flags did not have at the time of the subject incident or prior to the subject incident a preventative maintenance program that would prevent mechanical system failures, the maintenance program appeared to be a reactive program in which once a part failed and was damaged it was repaired or maintained.
- By Six Flags not having a preventative maintenance program it placed riders like Mr. Elkharroubi in an increased risk of harm.
- Splashtacular did not offer Six Flags with a thorough preventative maintenance program, in that they did not provide scheduled replacement procedures for crucial safety parts.
- Splashtacular considered the failure of certain trap door operating components as becoming severe.
- Splashtacular should have provided padding to the edges of the [. . .] trap door to protect patrons from high energy impacts on the edges of a partially opened trap door.
- Six Flags did not have the recommended amount of personnel by the Splashtacular to operate the ride.
- To the extent that Six Flags wanted Mr. Elkharroubi to cross his ankles, this instruction should ha[ve] been provided to him orally by the attendant, and it should have been written in the signage of the attraction, which was not the case.
- The operator/attendant of the ride should have made sure that Mr. Elkharroubi was in the correct position before commencing the launch sequence.
- Even with ankles crossed, if the trap door only opened partially, Mr. Elkharroubi would have still impact[ed] his leg with the trap door, if it did not open fully.
- Regardless [of] whether Mr. Elkharroubi's ankles were crossed or not, Six Flags placed Mr. Elkharroubi in a dangerous, but preventable condition by not properly maintaining the trap door in order to prevent its partial opening.
- Mr. Elkharroubi did not act in an improper manner and was not a cause of his injury.
- Mr. Elkharroubi's left fracture was a result of improper maintenance of the Bonzai Pipelines in that the trap door occluded the slide as it opened partially.

(*Id.*)

Dr. Calderon's opinions included in his supplemental written report dated February 14, 2019 (ECF No. 65-13 at 12-13), all of which "are stated within a reasonable degree of biomechanical engineering certainty," are as follows:

- There is no biomechanical mechanism for a rider in a [Bonzai Pipeline] slide to receive a torsional injury to his leg, in that there is no portion of the slide in which the rider's leg would have been prevented from moving while the rider's body rotates.
- The location of Mr. Elkharroubi's injury, tibial plateau, was not consistent with a torsional load.
- Splashtacular and/or Six Flags failed to properly put in place an inspection and maintenance protocol to effectively assure the drop gate operated in a reasonably safe manner and violated the applicable sections of COMAR as referenced [in Dr. Calderon's supplemental written report].
- The maintenance manual provided was inadequate to the task and was not followed by Six Flags.
- I agree with Mr. Lenz that rubber like material could have been added to the drop gate as described and such would have reduced the force of impact and potentially reduce the injury.
- The opinions in my original report remain unchanged.
- I disagree with the Lenz, Oostman and Paterson reports as stated [in Dr. Calderon's supplemental written report].

(*Id.*)

It appears that the core opinions of Dr. Calderon on which Plaintiffs rely are that (1) the water slide was defectively designed because the trap door was not coated in a rubber padding; (2) the trap door on the water slide malfunctioned on the date of Elkharroubi's injury; (3) the malfunctioning trap door was the cause of Elkharroubi's injury; (4) the trap door malfunctioned because it had not been properly maintained; and (5) Six Flags violated Maryland state regulations in failing to conduct the required inspections and keep proper maintenance records.[3] (*See* ECF No. 66 at 7.)

---

[3] The Court does not suggest that Plaintiffs have disclaimed or abandoned any of Dr. Calderon's other opinions, but those opinions are not relevant to the pending motions. The Court will focus on those opinions of Dr. Calderon that might allow Plaintiffs to establish Defendants' liability.

## 2.  Dr. Calderon's Opinions are Unreliable

For purposes of the pending motions, the Court will assume that Dr. Calderon, "a full-time expert witness" (ECF No. 63-4 at 26, 224), is qualified to render the opinions upon which Plaintiffs rely. Although Defendants dispute Dr. Calderon's qualifications (*see* ECF No. 63-1 at 2-18), as explained below, his opinions are based on a methodology so obviously unreliable that his qualifications are beside the point. The case of *Nease v. Ford Motor Co.*, 848 F.3d 219 (4th Cir. 2017) is controlling on this issue.

In *Nease*, the plaintiffs alleged that a motor vehicle accident was caused by a failure of the speed control system on the plaintiffs' vehicle. Plaintiffs designated an electrical engineer, Samuel Sero ("Sero"), as an expert witness. Sero opined that the vehicle's speed control cable was susceptible to becoming bound up in the throttle, and that such a failure could prevent a driver from slowing the vehicle. Sero observed dirt in the speed control assembly of the plaintiffs' vehicle and concluded that the accumulation of this debris must have created a "wedging effect," which would have kept the vehicle's throttle open even after the accelerator pedal was released and caused the plaintiffs' injuries. The defendant moved to exclude the Sero's testimony under *Daubert*, but the district court denied the motion. On appeal, the Fourth Circuit reversed and held that Sero's opinion was not reliable and that it should have been excluded under *Daubert*.

*Nease* reiterated that "a plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." *Id.* at 231 (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). In addition, a plaintiff may not prevail in a products liability case by relying on an expert opinion that is based merely on belief or speculation. *Id.* "One especially important factor for guiding a

court in its reliability determination is whether a given theory has been tested." *Id.* (citing *Daubert*, 509 U.S. at 593).

In its discussion, the court noted that Sero's opinion had three critical components: (1) the speed control assembly in the plaintiff's vehicle "was vulnerable to binding because the designed allowed for contaminants to lodge between the speed control guide tube and the casing cap"; (2) this sort of binding occurred in plaintiffs' vehicle, resulting in the accident at issue; and (3) there were safer alternative speed control assembly designs available at the relevant time. 848 F.3d at 231. To arrive at this opinion, however, Sero "conducted no testing whatsoever." *Id.* at 232. Instead, he based his opinion on (1) his post-accident examination of plaintiffs' vehicle in which he examined the speed control cable with a fiber-optic tube and (2) his review of a document the automobile manufacturer had prepared in connection with the design of another vehicle. *Id.* at 225-27.

The Fourth Circuit characterized Sero's opinion as "a hypothesis only" that "he failed to validate [] with testing." *Id.* at 232. "Sero's failure to test his hypothesis renders his opinions on the cause of [the] accident unreliable." *Id.* While Sero's theory was "plausible and may even be right, it is no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the cases." *Id.* (internal quotation marks omitted). Scientific methodology involves "generating hypotheses and testing them to see if they can be falsified." *Id.* (quoting *Daubert*, 509 U.S. at 593).

Because no single factor is dispositive to determining the reliability of an expert opinion under *Daubert*, the court went on to consider *Daubert*'s other "guideposts." *Id.* at 232. The court noted that Sero had "not published or otherwise subjected his theory to peer review." *Id.* (noting

that "it would hardly be possible to solicit peer review since Sero conducted no tests and used no 'methodology' for reaching his opinions other than merely observing dirt on the speed control assembly components"). The same problem arose when the court considered the potential rate of error of Sero's methodology. *Id.* ("[W]e cannot assess the potential rate of error of Sero's methodology—he did not employ a particular methodology to reach his conclusions.") Finally, the court noted the absence of evidence that Sero's theory had been accepted within the relevant scientific or engineering community. For these reasons, but especially because of Sero's failure to perform tests or studies to test his hypotheses, the court held that Sero's opinions (both as to the cause of the mechanical failure in the speed control system and the availability of a safer alternative design) were unreliable and should have been excluded.

Like the expert in *Nease*, Dr. Calderon did not validate his hypothesis with testing. He did not test a single component of the water slide or the trap door to attempt to validate his hypothesis that the drop gate malfunctioned, resulting in Elkharroubi's injury. (*See* ECF No. 63-4 at 101.) Instead, his opinion is based on his observation of the water slide nearly three years after the incident and his review of materials made available to him during discovery.[4] During this examination of the water slide, Dr. Calderon did not conduct any testing of the trap door or any other component.[5] Instead, he took some measurements and observed one of the trap doors that was "out of order" in a partially open position. (*See* ECF No. 63-4 at 61, 64.) At bottom, Dr. Calderon's opinion boils down to mere speculation. He speculates that because Elkharroubi suffered an injury to his left knee and leg, he must have been injured by the trap door of the

---

[4] Dr. Calderon's opinion may also be based on his experience having ridden the ride before. (*See* ECF No. 63-4 at 60.)

[5] The parties do not dispute that Dr. Calderon may have inspected a different launch module and drop gate than the one that allegedly injured Elkharroubi. At the time that Dr. Calderon inspected the ride, Elkharroubi could not recall which of the launch modules he had used.

water slide. (*See* ECF No. 63-4 at 60, 110, 116) ("If the trap door works properly this accident doesn't happen.") He speculates that the trap door must have malfunctioned because a properly functioning trap door would not have caused an injury like the one suffered by Elkharroubi. (*Id.* at 69, 106, 116.) He speculates that the trap door would not have malfunctioned if it had been properly maintained because a properly maintained trap door would not malfunction. (*Id.* at 70, 99-100, 116-17.) He speculates that if the trap door had been padded, Elkharroubi's injury would have been less severe because padding would have reduced the force of impact. (*Id.* at 108.) Dr. Calderon's opinions regarding the cause of Elkharroubi's injury and a safer alternative design for the trap door are based on complete speculation.

Dr. Calderon's opinions are even more speculative than those at issue in *Nease*. As Defendants correctly point out, the expert in *Nease* at least observed dirt in the speed control assembly, rendering his hypothesis at least plausible even if it was untested. Here, Dr. Calderon cannot point to a single observation of the trap door mechanism that would render his opinions plausible. Further, Dr. Calderon's methodology (which, again, is nothing more than speculation) has not been published or subjected to peer review. There is no evidence about the potential error rate of Dr. Calderon's methodology. And Plaintiffs have not put forth any evidence that Dr. Calderon's methodology has been accepted within the relevant scientific or engineering community. The same goes for his opinions on a safer alternative design of the trap door. Dr. Calderon never tested any proposed design that included rubber padding. He did not perform any computer modeling with respect to his proposed design. (*See* ECF No. 63-4 at 191-93.) He did not provide any scientific methodology for his proposed alternative design. He necessarily did not provide evidence of the potential rate of error of the methodology underlying his proposed alternative design. He is not familiar with whether his proposed alternative design has been

accepted within the relevant scientific or engineering community. (*See* ECF No. 63-4 at 41-45.) Dr. Calderon's opinions are based on pure speculation and must be excluded. *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 251 (4th Cir. 1999).

For these reasons, the Court concludes that Dr. Calderon's opinions are unreliable. Because the opinions are unreliable, they are inadmissible under Rule 702.[6] Plaintiffs have failed to carry their burden with respect to the admissibility of Dr. Calderon's opinions. Defendants' Motion *in Limine* (ECF No. 63) is **GRANTED**. The expert testimony of Dr. Calderon shall be excluded from evidence.

### B.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

---

[6] The Court is not required to determine the reliability of Dr. Calderon's opinions as to the Defendants' violation of Maryland state regulations. As explained later in this opinion, even if these opinions were relevant and reliable, even if Dr. Calderon was qualified to render such opinions, and even if the opinions were accepted as true, Defendants would still be entitled to judgment as a matter of law on Plaintiffs' claims. Nonetheless, the Court recognizes that Defendants have presented compelling arguments that Dr. Calderon is wholly unqualified to offer any opinion as to Defendants' violations of COMAR. During his deposition, he stated that he did not know what COMAR was and that he did not "have any idea what the regulations, laws or rules are in Maryland for the design of amusement park ride[s]." (ECF No. 63-4 at 26-27.)

The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must cite to "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### 1. Choice of Law

Because the Court's jurisdiction over this case is based on diversity, the Court must apply the choice of law rules of Maryland. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Maryland adheres to the *lex loci delicti* rule to determine the applicable law in tort actions. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). Under this rule, the "substantive tort law of the state where the wrong occurs governs." *Hauch v. Connor*, 295 Md. 120, 123 (1983). Because the alleged tort took place in Maryland, Maryland law governs each of Plaintiffs' claims.

### 2. Plaintiffs' Claims

In Count I of the Third Amended Complaint, Plaintiffs assert a negligence claim against Six Flags. (ECF No. 55 ¶¶ 43-47.) In Maryland, the elements of a negligence claim are "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or

injury proximately resulted from the defendant's breach of the duty." *Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 290 (2006).

In Count II, Plaintiffs assert that AZS and Splashtacular are strictly liable for Elkharroubi's injuries that resulted from the defective design of the water slide. (ECF No. 55 ¶¶ 48-50.) In Count III, Plaintiffs assert that AZS and Splashtacular are strictly liable for the Elkharroubi's injuries that resulted from "their defectively labeled product which was supplied without any [] adequate warnings." (*Id.* ¶¶ 51-53.) In Count IV, Plaintiffs assert that AZS and Splashtacular were negligent in connection with their "designing, manufacturing, supplying and assembling a defective or improperly manufactured product." (*Id.* ¶¶ 54-56.)

Judge Grimm discussed the elements of these product liability claims in *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 780 (D. Md. 2012):

> The negligence theory of product liability focuses on the conduct of the defendant, while the strict liability theory of products liability focuses "primarily on the *product* (and whether or not it can be deemed defective)." Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 255, 265 (4th ed. 2008) (emphasis in original) (citing *Collins v. Li*, 176 Md. App. 502, 933 A.2d 528, 573 (Md. Ct. Spec. App. 2007)). Yet under both theories of recovery, "a plaintiff must show 'three product litigation basics—defect, attribution of defect to seller [or manufacturer], and a causal relationship between the defect and the injury.' " *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 949 A.2d 26, 39 (Md. Ct. Spec. App. 2008) (citing *Ford Motor Co. v. Gen. Accident Ins. Co.*, 365 Md. 321, 779 A.2d 362, 369–70 (2001)); *see Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F.Supp.2d 606, 618–19 (D. Md. 2005) (same); *Virgil v. Kash N' Karry Serv. Corp.*, 61 Md. App. 23, 484 A.2d 652, 656 (Md. Ct. Spec. App. 2005) (same); *see also Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n. 3 (D. Md. 1993) ("The elements of proof are the same whether the claim be characterized as one for strict liability or negligence.").

Finally, in Count V, Plaintiffs assert a claim for loss of consortium. (ECF No. 55 ¶¶ 57-59.) "The loss of consortium, as used in the cases in Maryland . . . means the loss of society, affection, assistance and conjugal fellowship." *Deems v. W. Maryland Ry. Co.*, 247 Md. 95, 100 (1967). "The elements of a loss of consortium claim are: (i) injury to the marital relationship, (ii)

caused by the wrongful conduct of the defendant." *Kashaka v. Baltimore Cty., Maryland*, 450 F. Supp. 2d 610, 620 (D. Md. 2006) (citing *Deems*, 247 Md. at 95)).

### 3.    Defendants are Entitled to Summary Judgment

Defendants argue that they are entitled to judgment as a matter of law because Plaintiffs cannot prove that they breached any duty owed to Plaintiffs or that any such breach proximately caused Plaintiffs' injuries. In response, Plaintiffs assert a legal theory that is not recognized under Maryland law. The Court concludes that Defendants are entitled to summary judgment on all of Plaintiffs claims because Plaintiffs cannot demonstrate that Defendants breached any duty or that the breach of such duty caused Plaintiffs' injuries.

In their cross-motion for summary judgment and opposition to Defendants' motion for summary judgment (ECF No. 65), Plaintiffs assert that Defendants violated various provisions of the Code of Maryland Regulations ("COMAR").[7] (*Id.* at 9-20.) Plaintiffs incorrectly argue that "[i]n Maryland a violation of a statute or ordinance results in a presumption of evidence." (*Id.* at 14.) Defendants correctly note that Maryland law creates no such presumption under the circumstances of this case. *See Webb v. Green Tree Servicing, LLC*, No. ELH-11-2105, 2012 WL 2065539, at *6 (D. Md. June 7, 2012) ("Maryland does not recognize the negligence per se doctrine.")

In certain circumstances, Maryland law allows a plaintiff to recover on a statute-based negligence theory. *See Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 79 (2003). Under the "Statute or Ordinance Rule," a plaintiff may make a *prima facie* case of negligence by demonstrating "(a) the violation of a statute . . . designed to protect a specific class of persons

---

[7] The provisions that Plaintiffs allege were violated include COMAR 09.12.62.08 ("Accident Reporting"); 09.12.62.09 ("Amusement Attraction Operating Records and Reports"); 09.12.63.05 ("Daily Inspection"); 09.12.62.18 ("Maintenance"); and 09.12.62.17 ("Electrical Requirements").

which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Id.; see also Polakoff v. Turner*, 385 Md. 467, 476 n.5 (2005) (discussing the difference in the standard for establishing a *prima facie* case of negligence under a traditional theory and under a statutory-based negligence theory). Once a *prima facie* case of negligence is established, the defendant's negligence becomes a question for the fact finder, which must "evaluate whether the actions taken by the defendant were reasonable under all the circumstances." *Brooks*, 378 Md. at 79; *see generally Allen v. Dackman*, 413 Md. 132, 143-44 (2010) (discussing standards of liability in negligence actions based on statutory violations). Of course, contrary to Plaintiffs' arguments, a *prima facie* case of negligence would not entitle Plaintiffs to judgment as a matter of law. But in any event, Plaintiffs have not even demonstrated a prima facie case of negligence.

The Statute or Ordinance Rule does not apply in this case for two reasons. First, the COMAR provisions that Plaintiffs cite were not "designed to protect a specific class of persons," but instead were "passed for the benefit of the public." *See Blackburn Ltd. Partnership v. Paul*, 438 Md. 100, 114 (2014). Use of the Statute or Ordinance Rule "must be carefully circumscribed." *Id.* at 116 n.11 (internal quotation marks omitted). Under part (a) of the rule, "the statute or ordinance allegedly violated [must] set forth mandatory acts that are clearly for the protection of *particular* class of persons and *not* merely for the public as a whole." *Id.* at 116 (internal quotation marks omitted) (emphasis in original). In *Blackburn*, the court concluded that a statute that required landowners to erect a type of fence around pools was meant for the protection of a particular class, "namely children under the age of five." *Id.* at 125. Maryland has also recognized other statutes that were designed to protect a specific class of persons rather than the public at large. *See, e.g., Horridge v. St. Mary's Cty. Dep't of Soc. Servs.*, 382 Md. 170, 189-90 (2004) ("[T]he statute makes clear in several places that [its] sole and specific objective . . . is

the protection of a specific class of children—those identified in or identifiable from specific reports made to DSS and those also found in the home or in the care or custody of the alleged abuser."); *Brooks*, 378 Md. at 88 (finding that "certain provisions of the [Baltimore City] Housing Code were clearly enacted to prevent lead poisoning in children" inhabiting homes in Baltimore). In other cases, where statutes were not clearly designed to protect a specific class, Maryland courts have declined to apply the Statute or Ordinance Rule. *See, e.g., Fangman v. Genuine Title, LLC*, 447 Md. 681, 717-18 (2016) (holding that a statute prohibiting certain kickbacks in real estate transactions was not designed to protect "an identifiable class of persons," even though "consumers of settlement services . . . incidentally receive the benefit" of the law); *Gourdine v. Crews*, 405 Md. 722, 758 (2008) (holding that statutes and regulations prohibiting the placement of misbranded products into interstate commerce by drug manufacturers "are framed to protect the public in general," and that "a statutory obligation which runs to everyone in general and no one in particular cannot impose a duty between two parties") (internal quotation marks omitted); *Remsburg v. Montgomery*, 376 Md 568 (2003) (holding that certain statutes and COMAR provisions related to hunting and natural resources were not designed to protect any specific class of persons to which plaintiff belonged, or to protect against the kind of injury suffered by plaintiff); *Muthukumarana v. Montgomery County*, 370 Md. 447, 499-500 (2002) (holding that the statutory duty imposed on 911 operators to protect "the safety and well-being of the citizens of Maryland" was owed to the public at large).

Although Plaintiffs have not cited to any statutory language or evidence regarding what specific class of persons the COMAR provisions at issue were designed to protect, the Court notes that the stated purpose in both of the subtitles at issue is for the safety of the public as a whole. *See* COMAR 09.12.62.01 & 09.12.63.01. As a patron of an amusement park that is

regulated by these COMAR provisions, Elkharroubi may have incidentally received the benefit of the regulations. But "there is a difference between being a member of a group who arguably receives a benefit from a statute and being a member of a class whose injury the statute was designed to protect." *Fangman*, 447 Md. at 720. Because the COMAR provisions at issue are designed to protect the public at large rather than a specific class of persons that includes Plaintiffs, the Statute or Ordinance Rule is not available to Elkharroubi.

A second reason that the Statute or Ordinance Rule does not apply as Elkharroubi argues is that the alleged injury that Elkharroubi suffered is not the type that the COMAR provisions at issue were designed to protect against. In *Blackburn*, the statute at issue was meant to protect young children from drowning. In *Brooks*, the statute was designed to protect children inhabiting homes in Baltimore City from lead exposure. Here, the COMAR provisions that Plaintiffs cite were designed to "establish safety standards" for amusement attractions, and "to ensure that water slides . . . are safely constructed, operated, and maintained." COMAR 09.12.62.01 & 09.12.63.01. Plaintiffs have provided no argument or evidence to demonstrate that the injury they suffered (chiefly, an injury to Elkharroubi's left knee and leg) is the specific type of injury the COMAR provisions were designed to protect against. For these reasons, the Court concludes that the Statute or Ordinance Rule does not apply in this case.

Alternatively, even assuming that the Statute or Ordinance Rule does apply, Plaintiffs still cannot prevail on the pending motions. First, even assuming that Defendants violated COMAR 09.12.62.08 ("Accident Reporting") and 09.12.62.09 ("Amusement Attraction Operating Records and Reports"), such violations could not possibly have caused Plaintiffs' injuries. The salient portions of these provisions concern the obligation of an owner of an amusement park facility to make reports of accidents "involving serious physical injury," and to

maintain daily inspection reports in a certain format for between 30 days and one year. But there is no allegation that Elkharroubi was injured by faulty record-keeping on the part of Defendants. As such, any violations of COMAR 09.12.62.08 or 09.12.62.09 could not serve as a basis to impose liability on Defendants.

Second, no reasonable jury could conclude that Defendants violated the other sections of COMAR at issue (09.12.63.05 ("Daily Inspection"), 09.12.62.18 ("Maintenance"), and 09.12.62.17 ("Electrical Requirements")). Although Plaintiffs argue without offering evidentiary support that Defendants did not conduct the requisite inspections or perform the necessary maintenance on the water slide as required by COMAR, Defendants have submitted evidence that they fully complied with these provisions, including nearly 1,000 pages of inspection and maintenance records (ECF Nos. 63-9, 69-4 & 69-5), and evidence that establishes the compliance of the water slide's Programmable Logic Controller with COMAR 09.12.62.17 (ECF Nos. 63-7 at 51-165 & 65-15). In short, Defendants have submitted admissible evidence that they complied with the provisions of COMAR at issue and Plaintiffs have not submitted any admissible evidence to the contrary. As such, Plaintiffs have not generated a genuine dispute of fact as to Defendants' violations of COMAR.

Third, even assuming *arguendo* (1) that Defendants violated each of the COMAR provisions cited by Plaintiffs, (2) that the Statute or Ordinance Rule applies, and (3) that Plaintiffs have demonstrated a *prima facie* case of negligence, no reasonable jury could conclude that Defendants were negligent. As explained throughout this opinion, Plaintiffs have not submitted any admissible evidence that would allow a factfinder to conclude that Defendants caused Plaintiffs' injuries. Because the Court has excluded Dr. Calderon's opinions regarding the malfunctioning of the drop gate and its defective design, Plaintiffs have no evidence upon which

to rely to establish causation.[8] In cases where courts have found the Statute or Ordinance Rule to apply, plaintiffs have still been required to prove that the defendant's negligence was the cause of the plaintiff's injuries.[9] *See, e.g., Blackburn*, 438 Md. at 126-27 (stating that even if a plaintiff establishes a *prima facie* case of negligence under the Statute or Ordinance Rule, the plaintiff "must still produce facts that would allow a jury to reasonably conclude" that the plaintiff was injured because of the statutory violation); *see also Dackman v. Robinson*, 464 Md. 189 (2019); *Sugarman v. Liles*, 460 Md. 396 (2018); *Rogers v. Home Equity USA, Inc.*, 453 Md. 251 (2017); *Wietzke v. Chesapeake Conf. Assoc.*, 421 Md. 355 (2011); *Polakoff v. Turner*, 385 Md. 467, 478 (2005) ("[P]roof of a statutory violation, plaintiff's membership in the class of people designed to be protected by the statute, and causation, amount to *prima facie* evidence of negligence, not negligence *per se*.").

This case is no different. Even assuming that Defendants' inspection and maintenance procedures fell short of what was required by COMAR, there is no evidence that those specific failures resulted in Plaintiffs' injuries. As explained above, to establish causation under the circumstances of this case, Plaintiffs are required to rely on expert testimony. But the Court has

---

[8] Plaintiffs do not rely on the doctrine of *res ipsa loquitur*, which is appropriate because they are prohibited from doing so under *Holzhauer v. Saks & Co.*, 346 Md. 328 (1997). (*See* ECF Nos. 64-1 at 11 & 66 at 15.) In *Holzhauer*, the court recognized that "in cases concerning the malfunction of complex machinery, an expert is required to testify that the malfunction is of a sort that would not occur absent some negligence." *Id.* at 341. This is because "[m]echanical, electrical, and electronic devices fail or malfunction routinely. . . . [M]any things can cause these devices to malfunction." *Id.* at 340. "To allow an inference that the malfunction is due to someone's negligence when the precise cause cannot be satisfactorily established [is] unwarranted." *Id.* Here, as in *Holzhauer*, "because of the complexity of the subject matter, expert testimony is required to establish negligence and causation."[8] *Id.* at 339.

[9] Under a traditional theory of negligence, evidence that a defendant violated a statute can be evidence of negligence. The Statute or Ordinance Rule is most often invoked where the duty owed by a defendant is unclear or there are conflicting doctrines regarding the duty that applies. It appears that Plaintiffs have invoked the Statute or Ordinance Rule in this case not because there is any dispute as to the duty Defendants were under, but rather because Plaintiffs misunderstand the governing law.

excluded Dr. Calderon's opinions because they are unreliable, and Plaintiffs have not submitted any other expert testimony relevant to causation. It would be inappropriate, as Plaintiffs argue, to apply a presumption of negligence (or a presumption of liability as to any of the other counts) because of Defendants' violation of COMAR. Maryland law recognizes no such presumption.

In summary, Plaintiffs attempted to rely on the opinions of Dr. Calderon regarding the malfunctioning of the drop gate and its defective design. But those opinions have been excluded because they are speculative and unreliable. Without any expert evidence, Plaintiffs cannot establish that the breach of any duty by Defendants was the proximate cause of Plaintiffs' injuries. In an effort to establish Defendants' breach of a duty, Plaintiffs rely on a presumption that does not exist under Maryland law and do so without reliance on admissible expert evidence regarding causation. Plaintiffs' arguments fail on all counts. Because Plaintiffs cannot establish either the breach of any duty owed to them by Defendants, or that such breach was the proximate cause of their injuries, Defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment (ECF No. 64) is **GRANTED**.[10]

### 4. AZS's Liability

The Court has already awarded summary judgment as to all counts in favor of Defendants and against Plaintiffs. Alternatively, the Court will award summary judgment to AZS on Counts II, III, IV, and V of the Plaintiffs' Third Amended Complaint because AZS purchased Splashtacular's assets without assuming any of its liabilities in March 2014, after the water slide was constructed and placed into service. (ECF No. 64-1 at 2-3.) A copy of the Private

---

[10] Because summary judgment has been granted in favor of the Defendants as to Counts I, II, III, and IV, it must also be granted on the loss of consortium claim in Count V. *John Crane, Inc. v. Puller*, 169 Md. App. 1, 88 (2006) ("A claim for the loss of consortium based on an injury to one of the spouses is inextricably tied to the underlying personal injury claim.")

Foreclosure Sale Agreement is filed at ECF No. 64-2. This Private Foreclosure Sale Agreement provides that AZS would not assume the liabilities of Splashtacular. (ECF No. 64-2 at 2 ¶ 2.)

"Generally, a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation." *Martin v. TWP Enterprises Inc.*, 227 Md. App. 33, 49 (2016) (internal quotation marks omitted). There are some exceptions to this rule:

> In Maryland, the predecessor corporation's debts and liabilities become the obligation of the successor corporation when:
>
> (1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts.

(*Id.*) (quoting *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989)).

In this case, there was no express or implied assumption of liability by AZS. To the contrary, the Private Foreclosure Sale Agreement that AZS submitted in support of its motion for summary judgment states that AZS did not assume any of Splashtacular's liabilities. In addition, there is no suggestion here that the purchase of Splashtacular's assets by AZS through the Private Foreclosure Sale Agreement amounted to a consolidation or merger, or that AZS is a "mere continuation" of Splashtacular, or that the transaction was entered into fraudulently to escape liability for debts.

Plaintiffs' theory of liability as to AZS depends on AZS having assumed "all responsibility and liability" for the water slide from Splashtacular. But AZS has submitted uncontroverted evidence that it did not assume any of Splashtacular's liabilities. Because AZS purchased Splashtacular's assets after the water slide was constructed and placed into service,

and because AZS did not assume Splashtacular's liabilities, it cannot be held liable for any debts or liabilities of Splashtacular.

Plaintiffs oppose AZS's motion for summary judgment on a purely procedural ground. But again, Plaintiffs misstate the law. Plaintiffs argue that the Private Foreclosure Sale Agreement "is inadmissible since it has not been properly authenticated." (ECF No. 65 at 23.) But "the 2010 Amendments to Federal Rule of Civil Procedure 56 no longer require all documents submitted at the summary judgment stage to be authenticated." *Krell v. Queen Anne's Cty.*, No. JKB-18-0637, 2019 WL 6131076, at *4 (D. Md. Nov. 19, 2019). Instead, "the new requirement is that the party identifies facts that *could* be put in admissible form." *Wake v. Nat'l R.R. Passenger, Corp.*, Civ. No. PWG-12-1510, 2013 WL 5423978, at *1 (D. Md. Sept. 26, 2013); *see also Bank of Am., N.A. v. Jericho Baptist Church Ministries, Inc.*, No. PX 15-02953, 2020 WL 128455, at *3 (D. Md. Jan. 10, 2020). The Court concludes that the Private Foreclosure Sale Agreement could be produced as an authenticated document at trial. As such, consideration of this document is appropriate at the summary judgment stage under Fed. R. Civ. P. 56(c).

Plaintiffs also note that the Private Foreclosure Sales Agreement contains a choice of law clause. (ECF No. 65 at 23.) Specifically, the document provides that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of Kansas." (ECF No. 64-2 at 3.) However, Plaintiffs make no effort to identify any conflict between Kansas law and Maryland law on the issue of a successor corporation's liability for the liabilities of a predecessor corporation. But it makes no difference. Kansas law is in line with Maryland law on this point. *See Comstock v. Great Lakes Distrib. Co.*, 209 Kan. 306, 310 (1972) ("Generally where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or

impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts." (internal quotation marks omitted)); *see also Moore v. Pyrotech Corp.*, 13 F.3d 406 (10th Cir. 1993) (noting that "Kansas has adopted the general rule of nonliability of a transferee corporation for the prior debts of the transferor") (internal quotations omitted).

For these reasons, the Court concludes that AZS cannot be held liable for the debts and liabilities of Splashtacular because it did not assume those liabilities in the Private Foreclosure Sales Agreement. AZS is entitled to judgment as a matter of law as to Counts II, III, IV, and V.

### C.    Plaintiffs' Motions

The Court will overrule the evidentiary objections set forth in Plaintiffs' reply in support of their motion for summary judgment (ECF No. 71-1). As stated above, at this stage of the proceedings, Defendants are not required to authenticate the documents to which Plaintiffs object. *See, e.g., Krell*, 2019 WL 6131076, at *4. All of the documents to which Plaintiffs object could be put in admissible form for trial. Accordingly, it would be inappropriate to exclude them under Rule 56(c).

The Court will deny Plaintiffs' motion *in limine* (ECF No. 66 at 14-18). First, Plaintiffs' argument relies on a misapprehension of Maryland law. As explained above, Maryland does not recognize a "presumption of negligence" under the circumstances of this case. Second, Plaintiffs fail to point to any deficiency in any of Defendants' proffered experts' opinions that would warrant their exclusion, or to present any coherent argument for why such opinions should be

excluded.[11] Third, the Court adopts the arguments set forth in Defendants' opposition to Plaintiffs' motion *in limine* as an alternative basis to deny that motion. (ECF No. 70 at 4-7.)

The Court will deny Plaintiffs' cross-motion for summary judgment (ECF No. 65) for the reasons stated in this opinion. Plaintiffs have failed to establish that they are entitled to judgment as a matter of law because they have failed to produce admissible evidence that would be legally sufficient for a reasonable jury to render a verdict in their favor.

## III.    CONCLUSION

In summary, Defendants' "Motion *in Limine* to Preclude Plaintiff from Calling Andres Calderon, Ph.D." (ECF No. 63) is **GRANTED**; Defendants' Motion for Summary Judgment (ECF No. 64) is **GRANTED**; Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 65) is **DENIED**; and Plaintiffs' Motion *in Limine* (ECF No. 66) is **DENIED**. The Clerk will be directed to **CLOSE** this case. A separate Order will accompany this Memorandum Opinion.


March 4, 2020                                    _____/s/_____
Date                                                    Timothy J. Sullivan
                                                          United States Magistrate Judge

---

[11] The Court has only relied on the opinions of Defendants' proffered experts in making alternative findings. The Court did not rely on these experts' opinions in concluding that Dr. Calderon's testimony must be excluded and that Plaintiffs have failed to produce evidence that would allow a jury to render a verdict in their favor.